[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 5, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-15262
_____

D. C. Docket No. 98-08031-CV-KLR

EDWARD BROCHU,

Plaintiff-Appellee,

versus

CITY OF RIVIERA BEACH,

Defendant-Appellant,

WILLIAM HUNTER,
DENNIS WIDLANSKY, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 5, 2002)**

Before TJOFLAT and KRAVITCH, Circuit Judges and DOWD[*], District Judge.

DOWD, District Judge:

This case involves a claim by a former employee of the City of Riviera Beach police department that he was subjected to adverse employment actions in retaliation for conduct protected by Title VII and by the First Amendment. The case was tried to a jury. Defendant-appellant, City of Riviera Beach, appeals from the district court's partial judgment and final judgment in favor of plaintiff-appellee, Edward Brochu, and from orders denying motions for judgment as a matter of law and for a new trial.

We write at some length to provide guidance as to the appropriate procedures for district courts to follow in cases of this kind which involve the balancing an employee's right to function as a citizen in a free society against a public employer's right and need to maintain reasonable control over the effectiveness of the services it provides.

In light of our discussion below, we reverse the judgment of the district court and remand for entry of judgment in favor of the City.

I.

_____

[*] Honorable David D. Dowd, Jr., U.S. District Judge for the Northern District of Ohio, sitting by designation.

A.

In 1987, plaintiff-appellee, Edward Brochu ("Brochu"), was hired by the City of Riviera Beach ("the City") as a police officer. While he was employed full-time by the City police department, Brochu earned an undergraduate degree in human resource management and a graduate degree in business administration. After serving in several different capacities within the department, Brochu was eventually promoted to Lieutenant in the Detective Division on April 29, 1996.

About a month before his promotion in 1996, Brochu was approached by Lieutenant Blase Pfefferkorn about the possibility of assisting the FBI with an ongoing investigation into alleged corruption in the City police department. One target of the investigation was Major David Harris, Brochu's supervisor. Brochu began assisting with the investigation in March 1996 and, in June or July 1996, he informed Jerry Poreba, the Chief of Police, about his involvement.[1]

Even though Brochu believed that Poreba had informed Harris about the investigation, Harris testified at trial that he learned it from Sergeant Richard Sessa.[2] In any event, Harris confronted Donatto with his knowledge of the

---

[1] It appears that this investigation may have commenced in August 1994 when Sergeant Kathy Donatto, with Chief Poreba's concurrence, developed and took to the FBI information from an informant that another sergeant was involved in drug trafficking and that Harris, then a lieutenant, was aware of that fact. Pfefferkorn was subsequently directed by Chief Poreba to join the investigation.

[2] Sessa testified that he first learned of the investigation from a former City police officer who still had contacts with the department. Sessa went to Pfefferkorn with his knowledge of the investigation;

3

investigation; at that time, she simply denied any involvement, but reported the confrontation to Poreba. Her relationship with Harris immediately began to deteriorate. Some time later, after Donatto had what she thought was a confidential meeting with Acting City Manager Dennis Widlansky wherein she complained about Harris, Harris called a mandatory staff meeting and angrily reported to everyone that he was not going to stand for people questioning his integrity.

While all of this was developing, two other relevant matters were occurring. First, a white officer named Steven Lobeck was suing the City police department for alleged reverse race discrimination in discipline and, second, the police union ("the PBA")[3] was actively supporting candidates for the March 1997 City Council elections.

With respect to the Lobeck litigation, Brochu was subpoenaed for a deposition on December 5, 1996. He told Chief Poreba's in-house lawyer, Mr. Russell, about the subpoena. The City's outside counsel, Mr. Williams, was present at the deposition, where Brochu testified critically about the police

---

Pfefferkorn was angry about the leak and, after talking by telephone to Poreba and Donatto, Pfefferkorn ordered Sessa to be silent about what he knew or face charges of obstruction. Sessa complied with the order until later, while assigned to road patrol, he learned from another officer that Pfefferkorn was going around saying that Sessa had "ratted out" Harris, triggering the FBI investigation. This made Sessa angry and, notwithstanding Pfefferkorn's prior order, Sessa went to Harris to set the record straight.

[3] The police union, which bargains collectively for all its members, goes by the name "Police Benevolent Association."

department.  As Brochu returned to Riviera Beach following the deposition, he was paged by Pfefferkorn, who informed him that "they" were angry about the testimony and that Brochu was to be transferred from the detective division to road patrol.[4]  On December 6, 1996, a memo was posted indicating the transfer, which would be effective on Sunday, December 8, 1996.  Brochu ended up on the midnight shift of road patrol.

This transfer resulted in no change in rank or salary; however, Brochu testified that it was less prestigious than a detective position and resulted in the loss of certain benefits.[5]  Not long after this transfer, Brochu was also removed from his roles as public information officer and chairman of the awards committee, which resulted in loss of overtime opportunities.

Chief Poreba testified that it was his practice to routinely reassign officers so as to avoid development of what he called "tunnel vision."  According to Poreba, this occasional reassignment helped officers keep a fresh perspective.  Transfer was neither a form of discipline nor necessarily an expression of displeasure with an officer's work, although it was often perceived as both by the transferee.

---

[4]  Although Pfefferkorn testified at the trial, no one asked him about this alleged conversation.  Therefore, there is no confirmation that this occurred in the way Brochu testified.

[5]  Brochu claimed that he lost a take-home automobile, a $500 annual clothing allowance, a flexible schedule, holidays off, access to his own personal computer, a 24-hour cell phone, and various training opportunities.  The patrol job was also believed to be more dangerous than the detective job and resulted in a lost opportunity for advancement to a detective-commander job.

Poreba further testified that reassignments were typically announced toward the end of the week and generally took effect on Sunday, the beginning of the pay period.

In this case, Poreba stated that he decided to transfer Brochu because he had attitude problems and difficulty getting along with both managers and co-workers.[6] The official reassignment was made on December 6, 1996, a Friday. Poreba also testified that he was under the impression that Brochu himself chose the midnight shift and was able to do so because he had seniority. He further testified that Brochu was removed as public information officer because that position was always held by a detective, who was most likely to be available when public information needed to be disseminated. Finally, he stated that he did not remove Brochu alone from the awards committee; rather, in a memo dated January 10, 1997, he replaced the entire committee, thanking the former members for "a job well done."

The second set of circumstances developing during the relevant time period relates to the PBA's long-time involvement in municipal politics. Its involvement typically included supporting candidates for office. Although, in 1994, it had used

_____

[6] Brochu's performance evaluations up to that time were predominantly favorable, although his last two evaluations (for January to July 1996 and April to October 1996) both noted that he needed to improve his attitude and his relationship with people. The overlap of these two evaluation periods is attributed to the fact that he was promoted in April and fell under different supervision.

its influence to oust then-Chief Brooks and replace him with Poreba, in late 1996, the PBA published a survey showing disenchantment with Poreba's leadership.[7] Poreba went on local radio and complained that the PBA's survey was a publicity stunt aimed at meddling in police affairs and removing him as chief. He also stated that the PBA was not going to run his department. Poreba testified at trial that he knew as early as 1996 that the PBA was "after him."

In November 1996, Brochu's colleague, Lieutenant Michael Gilles, the local PBA representative, asked Brochu to help support three candidates in the March 11, 1997 city council elections. These particular candidates would apparently support the PBA's goal of removing Poreba and would also favor cleaning up alleged corruption in the police department. Gilles asked Brochu to work with him and Don Hendrickson, a civilian with aspirations to be appointed city manager,[8] to draw up a "business plan" for the elections. The true nature of this plan has been a

---

[7] Although Brochu characterized this disenchantment as "widespread," apparently the PBA refused to reveal the raw numbers of members who actually responded to the survey. Therefore, in theory, if only ten members responded and nine of those ten were disenchanted with Poreba, this apparent 90% disenchantment might arguably be characterized as "widespread." That conclusion, however, would have little statistical merit.

[8] The city manager position was a city council appointment.

pivotal dispute in this litigation.  The City has argued consistently that the business

plan was really a plan to take over the police department.[9]

Presuming the slate of favored candidates won their elections to city council,

and presuming they would then replace the existing city manager with Don

Hendrickson, the plan then called for Chief Poreba's removal.  He would be

---

[9] A copy of the 45-page plan was admitted into evidence as Plaintiff's Exhibit 8.  Although the pages of this exhibit appear to be out of order, the exhibit contains the following:
- -- a listing of five "Immediate Goals" under a heading of "Riviera Beach Police Department;"
- -- a three-page description of goal 1 (integrity);
- -- a one-page description of goal 2 (staff inspection - current status);
- -- a one-page description of goal 3 (the policy and procedure manual - direction);
- -- a two-page description of goal 4 (problem oriented policing - method);
- -- a two-page description of goal 5 (total quality management - path);
- -- an organizational chart, complete with names;
- -- an Investigative Team Overview;
- -- two memos from "Acting Chief Gilles," each dated March 19, 1997, to Major Franklin and Major Harris putting them on paid administrative leave and setting forth the conditions of that leave;
- -- a memo dated March 19, 1997 from Acting Chief Gilles to all police personnel announcing the assignment of officers to various positions, including the assignments of Wiesen, Childers and Brochu to Acting Captain positions, and Pfefferkorn to the Support Services Bureau;
- -- memos dated March 20, 1997 from Acting Chief Gilles to all police personnel announcing (1) changes in standard operating procedures; (2) a staff inspection; (3) a review of all duty assignments; (4) reorganization of the Special Response Team, including the fact that Pfefferkorn would take over command of that team; (5) an inspection of all department vehicles; (6) personnel assignments; and (7) vehicle assignments;
- -- listings of take-home cars and cell phones;
- -- a three-page chart listing the names of all personnel down the left side and what appear to be categories of review across the top;
- -- a two-page chart of shift assignments for each employee;
- -- a news release prepared by "Acting Captain Edward Brochu," announcing that Poreba, Harris and Franklin had been placed on administrative leave effective March 19, 1997, and that Gilles had been appointed Acting Chief;
- -- a listing of the Staff Inspection Team Members and their respective credentials;
- -- a listing of the salaries of the various management personnel;
- -- an undated and apparently incomplete six-page memo from Acting Captain Brochu to an unnamed Acting City Manager (a space is left to insert a name) and Acting Chief Gilles regarding staff inspection, management practices, and the Policy and Procedures Manual.

replaced by Gilles. The positions of assistant chief and major would be eliminated and replaced by captains, those positions being assumed by Brochu and other officers sympathetic to the cause.[10]

The plan also included a news release announcing all of the changes and announcing the beginning of an investigation into allegations of police corruption and mismanagement of the department. Under the plan, Brochu was to lead this investigation. The existing policies and procedures of the department would be replaced with ones drafted by Brochu. Poreba and the other officers targeted for removal would be required to immediately turn over their badges, weapons, keys, vehicles, phones, calendars, and files, and be thereafter placed on administrative leave and confined to their residences from 9:00 a.m. to 5:00 p.m. on weekdays, apparently without any findings of cause for their removal.

Although Gilles and Brochu intended to keep the plan secret until its implementation after the March 1997 election, one night at Brochu's house, very shortly before the election, they showed the plan to Don Hendrickson, the man interested in becoming city manager. Hendrickson testified that he was actually "shocked" by the plan, that he had absolutely no input into its development, and

---

[10] Brochu even testified that, on March 14, 1997, three days after the election where the three candidates were successful, he went to the uniform store and purchased captain's bars and gold stars. For reasons that were not made clear at trial, the uniform store sent a copy of the sales receipt to Chief Poreba.

that he had never sought any advice from Brochu, Gilles, or Pfefferkorn about how to organize and run a police department.

Hendrickson also testified about events leading up to the revelation of Brochu's plan. He reported that, sometime in 1996, he was invited to a meeting at the home of Bud Beer[11] where he met with Beer and his wife, along with Brochu and Gilles. Brochu produced boxes of what appeared to be confidential police reports about various officers and events. Hendrickson said that the point of the meeting was to impress upon him that the police department was in trouble; however, he testified that he was not convinced because he knew many of the allegedly "corrupt" officers personally.

Hendrickson also testified that, about three or four weeks before the March 1997 city council election, he was invited to the home of Councilwoman Marilyn Moffitt, where she and Pfefferkorn verbally laid out a plan to put Poreba, Harris, Franklin and Assistant Chief Bunch on administrative leave and appoint Gilles as chief of police. The idea was to accomplish this at the very first meeting of the newly elected city council, scheduled for March 19, 1997, immediately after the swearing-in ceremony. Hendrickson was told that there were police officers lined up to keep order at the meeting, in anticipation that council's actions would cause a

_____

[11] Hendrickson identified Beer as a member of a neighborhood crime watch group.

10

problem. He said it was made perfectly clear to him that the only way he would be supported for the city manager position following the election was if he supported Moffitt's and Pfefferkorn's proposal.

The evidence at trial was conflicting as to whether Gilles and Brochu gave Hendrickson a copy of Brochu's "business plan" or whether he took it surreptitiously that night when he met with them at Brochu's home. In any event, Hendrickson had a copy and, except for confiding in one close friend, he initially kept it to himself, along with the fact that he did not support the plan and probably would not implement it if given the chance. Shortly after the election, Hendrickson revealed the plan to William Burrs, a newly-elected councilman, who had approached Hendrickson about voting out the current city manager. Burrs was also astonished by the plan and told Hendrickson to give a copy to Poreba.

Poreba learned of the plan on March 17, 1997 and it hit the media the next day. Public furor erupted. Even Brochu admitted that it was the "top news story for several days afterward" and that it "went on for months." Poreba had a meeting with the city manager and legal counsel. In Poreba's opinion, development of the plan constituted a violation of department policy and the police code of ethics, at least in part because it involved revealing internal department policies, procedures and business to civilians. Poreba also had great concern for "organizational

11

effectiveness" following the public release of the plan. He even met with the county Sheriff to find out whether that office would be available to help out if a major crime occurred. Poreba feared his own police department was in too much upheaval to handle any such event effectively. He characterized this time when the plan became public as "very tumultuous" and "very tense."

On March 19, 1997, on Poreba's recommendation, the city manager placed Gilles and Brochu on paid administrative leave, pending an investigation into their actions. Soon thereafter, Pfefferkorn was also placed on paid leave. Under the initial terms of the leave, Brochu, Gilles and Pfefferkorn had to be available to the department by home telephone or department-issued pager from 9:00 a.m. to 5:00 p.m. weekdays.[12] When they complained of receiving threats on their pagers, Poreba directed them to turn in their pagers and required them to remain at home during those weekday hours, unless they obtained permission to leave.

Poreba initially had Harris conduct an informal investigation, including interviews of several of the major players. Thereafter, Poreba filed a formal complaint accusing Brochu, Gilles and Pfefferkorn[13] of "engaging in a Concerted

---

[12] In addition, they were prohibited from entering any police facility or substation unless they had prior permission from the assistant police chief and they were not allowed to participate in any event sponsored by or identified with the police department unless they had prior written permission from the police chief. Violation of the terms of their leave would subject them to discipline.

[13] An Officer Paul Peterson was also named in the complaint, apparently because, as a PBA representative, he had played some role in the political activities surrounding the March 1997 election.

Job Action against the Riviera Beach Police Department." The City Manager, Gerald Adams, then engaged the services of Steven Bertucelli to conduct an independent internal affairs investigation of the alleged misconduct.

Brochu, Gilles and Pfefferkorn filed a lawsuit in state court, with the PBA's help, seeking to stop Bertucelli's investigation into the "take-over" plan. On June 11, 1997, immediately after the state court held a hearing and rejected the lawsuit, Brochu resigned by handing Poreba a typewritten letter stating that he had been forced out by "constant harassment, threats, intimidation, discrimination, hostile work environment, and violation of protected rights[.]"

Poreba acknowledged Brochu's letter of resignation in a memo dated June 23, 1997. He encouraged Brochu to pursue administrative remedies in the form of an internal investigation into his allegations of impropriety. Brochu declined. He also never grieved any aspect of what had occurred, arguing at trial that nothing was grievable.

Brochu claimed that he resigned because the conditions of his administrative leave were unprecedented and because he could see "the writing on the wall" and knew it was only a matter of time before he would be terminated. He claimed he was trying to mitigate his damages by seeking other employment before that would be impossible due to the complete tarnishing of his reputation.

13

B.

On January 16, 1998, Brochu filed a Complaint (later amended) against the City and several other defendants in their individual capacities[14] setting forth six counts: Title VII claims of (1) reverse race discrimination, (2) racially hostile working environment, and (3) retaliation; Section 1983 claims under (4) the First Amendment and (5) the Fourteenth Amendment; and (6) a Section 1985 conspiracy claim.

The district court granted summary judgment in the City's favor on Counts 1, 2, 4 and 5, and in the individual defendants' favor on Count 6. In response to a motion for reconsideration, the district court reinstated Count 5. The case was tried to a jury on the Title VII retaliation and the § 1983 First Amendment claims, Counts 3 and 5, respectively.

The Title VII claim was based on Brochu's allegation that, because he testified against the City in the Lobeck litigation, he was retaliated against by being transferred to a less desirable assignment, with significant changes in job duties and responsibilities. The Section 1983 First Amendment claim was based on allegations that: (1) the City had engaged in a pattern and practice of retaliating against employees who exercise their first amendment rights; (2) Brochu, along

---

[14] He sued individually the following persons: William Hunter, Dennis Widlansky, Gerald Adams, Jerry Poreba, Clarence Bunch, David Harris, and Ralph Franklin.

with others, had responded to a request to participate in an FBI investigation into the City police department; (3) during his off-duty hours Brochu had actively participated in the election campaigns of various reform candidates for the city council of Riviera Beach, who had made campaign promises to clean up problems in the police department; and, (4) Brochu and other interested persons met in February 1997 to discuss the problems in the police department and to formulate potential solutions. Brochu alleged that, as a result of these anti-corruption activities he was placed on administrative leave and subjected to conditions that were so intolerable as to cause him to involuntarily resign his employment under circumstances amounting to a constructive discharge.

Answering special interrogatories, the jury awarded Brochu $2,000.00, after finding that the City had retaliated against him for engaging in conduct protected by Title VII.[15] The jury also awarded Brochu an additional $450,000.00 on his First Amendment claim, after finding that protected speech activity was a substantial and motivating factor for the City's decision to place Brochu on administrative leave, an action which amounted to a constructive discharge, that could not be explained by any reason other than his speech activity. This latter

---

[15] In closing argument, Brochu's counsel had acknowledged that the Title VII claim was "a small claim" for which he was asking only "a couple of thousand dollars to cover . . . out-of-pocket losses[ ] [a]nd whatever you feel would be reasonable in connection with his pain and suffering."

award was significantly more than the amount requested by Brochu's counsel during his closing argument.[16]  On March 2, 2001, the district court entered a partial final judgment awarding Brochu $452,000.00 with interest from that date at a rate of 6.052.  The court reserved judgment with respect to prospective relief, attorneys fees and costs.

The City renewed its motion, originally made at trial, for judgment as a matter of law.  It also moved for a new trial and/or for remittitur.  On April 27, 2001, the district court denied all of these motions.

Brochu then sought prospective relief.  On August 10, 2001, the district court, having conducted a hearing, issued its final judgment.  The court concluded that the City had made an unconditional offer to reinstate Brochu which he had accepted effective July 26, 2001.  The court ordered reinstatement "to duty as a lieutenant of police within 45 days of the date of this Order, the delay being to afford the City a period within which to decide whether to appeal and seek a stay and/or to afford Mr. Brochu time to give appropriate notice to the Martin County Sheriff's Office."[17]  The court further ordered that this reinstatement was to occur

---

[16]  In closing argument, counsel stated the an appropriate award would be "$124,000 for his economic damages, . . . [and] at least the same amount would be appropriate for his intangible damages, his human damages, the things that [sic] took away from him as a human being."

[17]  At the time of trial, Brochu was employed as a deputy sheriff for Martin County, assigned to the midnight shift of the road patrol.

"regardless of any appellate determination concerning the jury's verdict of March 2, 2001[.]"  The City was ordered to "assign Lt. Brochu as commander of the detective bureau, the position from which the jury determined at the trial of this matter that the City removed Lt. Brochu in retaliation for his having testified in [the Lobeck case] . . . effective on the earlier of the occurrence of a vacancy in the position of detective bureau commander or one year from the date of this order, whichever is earlier."  The court further specified Brochu's compensation level upon reinstatement and pay rates for past periods (for use in calculating benefits).  It awarded $9,500.00 in back pay and interest and directed the City to modify Brochu's employment record to indicate that he had been wrongfully terminated and then reinstated by court order.[18]

The City timely appealed from the March 2, 2001 partial final judgment, the April 27, 2001 order denying the City's motion and renewed motion for judgment as a matter of law, and the August 10, 2001 final judgment awarding prospective relief.[19]  On December 5, 2001, the partial final judgment of March 2, 2001 and the final judgment of August 10, 2001 were stayed pending appeal.

[18]  The district court reserved jurisdiction to award attorney fees, costs and expenses.  On December 3, 2001, the Court awarded fees in the amount of $215,752.00, costs in the amount of $30,171.70 and supplemental fees and costs in the amount of $16,464.08.

[19]  Brochu cross-appealed the district court's orders granting summary judgment as to certain counts of his complaint.  (No. 01-15351).  On November 15, 2001, this appeal was dismissed for want of prosecution pursuant to 11th Cir.R.42-2(c).

II.

A.

The City raises several arguments on appeal. First, it questions whether Brochu established a Title VII claim of retaliation since Poreba testified that he was unaware of Brochu's deposition testimony at the time he made the decision to transfer Brochu. Second, the City argues that Brochu failed to establish a § 1983 First Amendment claim for two reasons: (1) because he did not engage in speech that was protected under the First Amendment; and (2) because the conditions of his paid leave were not so intolerable that a reasonable person would be forced to resign. In any event, the City asserts that a new trial on this claim is required because the court's definition of "protected speech" in the jury instruction was erroneously overbroad. Third, the City argues that the district court erred in ordering Brochu's reinstatement, regardless of the outcome of this appeal, upon its finding that, following the jury verdict, the City had made an unconditional offer of reinstatement which Brochu had accepted. Finally, the City asserts that several of the district court's evidentiary rulings were erroneous because they permitted the admission of evidence and testimony that was so inflammatory and prejudicial as to require a new trial.[20]

---

[20] Brochu's brief devotes considerable space to an argument that the City had failed to preserve any of these issues for appeal. We have examined all of his arguments in light of the full record and find

18

B.

We review *de novo* the denial of a motion for judgment as a matter of law, and, in applying the same standard as the district court, we view all facts, by whomever presented, in a light most favorable to the nonmoving party. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001). A verdict must stand unless "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue[.]" Fed.R.Civ.P. 50(a)(1). It is the jury's task--not ours -- "to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (internal quotation marks omitted). If reasonable jurors could reach different results, we must "not second-guess the jury or substitute our judgment for its judgment." *Id.*; *Gupta*, 212 F.3d at 582. We review denial of a motion for new trial under the abuse of discretion standard. *Lambert v. Fulton County*, 253 F.3d 588, 595 (11th Cir. 2001).

Whether a plaintiff engaged in speech protected by the First Amendment is a question of law which must be determined by the district court before a § 1983 claim can be submitted to the jury. *Bryson v. City of Waycross*, 888 F.2d 1562,

---

them completely lacking in merit. In our view, each of the issues was properly preserved.

19

1656-66 & n.2 (11th Cir. 1989). The constructive discharge issue, being a question of fact, is subject to the clearly erroneous standard of review. *See Buckley v. Hospital Corporation of America*, 758 F.2d 1525, 1530-31 (11th Cir. 1985). However, a constructive discharge claim does not present a jury issue unless a plaintiff produces substantial evidence that conditions were intolerable. *See, e.g., Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1526-27 (11th Cir. 1991) ("[b]efore finding a constructive discharge, this court has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable'").

This Court "review[s] jury instructions *de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party." *Palmer v. Board of Regents*, 208 F.3d 969, 973 (11th Cir. 2000). The Court reviews evidentiary rulings for abuse of discretion and reverses for a new trial where there is substantial prejudice. *Anderson v. WBMG-42*, 253 F.3d 561, 563 (11th Cir. 2001); *see also* Fed.R.Evid. 103(a) ("[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"); Fed.R.Civ.P. 61 (an erroneous evidentiary ruling is not subject to reversal "unless refusal to take such action appears to the court inconsistent with substantial justice").

A district court's decision to order reinstatement is reviewed for abuse of discretion. *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985). Where, in reaching that decision, the district court makes a legal determination, we review that legal determination *de novo* and examine relevant factual findings for clear error. *Reynolds v. Roberts*, 202 F.3d 1303, 1313 (11th Cir. 2000).

1.

To establish a prima facie case of retaliation under 42 U.S.C. § 2000e-3(a), a plaintiff must show "that (1) [he] engaged in . . . statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) there is a causal [connection] between the two events." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000). If "a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant" to produce "legitimate reasons for the adverse employment action." *Id.* at 507 n. 6 (internal quotation marks omitted). If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual. *Id.*

The City asserts that Brochu's Title VII retaliation claim fails as a matter of law because there is no record evidence that, prior to making the decision to transfer Brochu, Poreba had any knowledge that Brochu had testified in the Lobeck

21

case; in other words, the City asserts that there was no causal connection between Brochu's transfer and his protected activity.

Poreba testified that he was not aware that Brochu had been deposed much less that his deposition testimony was unfavorable to the City. Counsel for the City, Gerald Williams, who had conducted the relevant deposition, also testified that he never discussed the deposition with Poreba or anybody else. He stated that it was his practice not to chance tainting other witnesses by discussing such matters. Although Brochu testified that he had told Matthew Russell, the police department's in-house counsel, that he was to be deposed, Poreba testified that he had never spoken to Russell about the deposition. When the City attempted to call Russell as a witness, Brochu objected that he was not on the witness list and the trial court did not allow Russell to testify.[21]

The City argues that neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge. *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001). Nor, the City asserts,

---

[21] The City argued that it had not identified Russell as a witness because it did not know he would be needed until, during re-direct examination of Gerald Williams, the City attorney who had conducted the Lobeck deposition, Brochu had introduced his own deposition testimony suggesting that he had told Russell about the deposition. The City attempted to exclude Brochu's deposition from the trial, but the trial court overruled that motion. Therefore, in the City's view, it had no way of knowing ahead of time that it would need to call Russell. The district court did not accept this argument and refused to allow the City to call Russell as a witness. In our view this was error, although probably harmless error in view of other testimony supporting the proposition that Poreba had no knowledge of the deposition prior to his decision to transfer Brochu.

22

can mere coincidence in timing raise an inference of actual knowledge "where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

This Court concludes, having carefully examined the entire record, that no reasonable jury could find even circumstantial evidence that would sufficiently suggest that Poreba transferred Brochu in retaliation for his deposition testimony.[22] The coincidence in timing is simply not enough, in the face of the testimony that: (1) Poreba did not contemporaneously know about the deposition; (2) the City's attorney had not spoken with Poreba about the deposition; (3) Brochu had been having trouble relating to supervisors and coworkers, as reflected in his evaluations; (4) transfers were typically announced at the end of the week and became effective upon the next Sunday; and (5) although Brochu claimed to have been contacted by Pfefferkorn on his way back from the deposition with a "head's up" that "they" were angry and that Brochu was to be transferred, no one asked Pfefferkorn to confirm this at trial, not even Brochu. Although Brochu may have believed that his transfer resulted from his deposition against the City, that self-serving belief is not sufficient to establish retaliation under Title VII.

---

[22] For purposes of this opinion, the Court will assume, without deciding, that the transfer to road patrol was an adverse employment action.

We conclude that the district court erred in denying the motion and renewed motion for judgment as a matter of law with respect to the Title VII retaliation claim and we reverse both the judgment and the award of damages on this claim.

2.

a.

Although it is well-established that an employer may not discharge a public employee in retaliation for the employee's exercise of his right to freedom of speech, that right is not absolute. *Rankin v. McPherson*, 483 U.S. 378 (1987). "The problem in any case is to arrive at a balance between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Education*, 391 U.S. 563, 568 (1968) (articulating what has come to be known as "the *Pickering* balancing test").

Since the *Pickering* decision, a four-stage analysis has evolved for examining these types of cases involving a public employee's exercise of First Amendment rights. At the first stage, the trial judge must determine the threshold legal question of whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." *Rankin*, 483 U.S. at 384

(quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). This involves an examination of the content, form, and context of the speech. *Rankin*, 483 U.S. at 384-85. If that threshold is established, the trial judge proceeds to the second stage and applies the *Pickering* balancing test, weighing the interests of the public employee against the interest of the public employer, again considering the context and circumstances of the employee's speech. *Id*. at 388.[23]

Only if those two stages are satisfied does the matter go to the fact-finder, i.e., the jury, for a determination of whether the speech which the court has identified as protected played a substantial part in the employment decision. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977). If so, then the employer must prove that it would have reached the same decision "even in the absence of the protected [speech]." *Id*. This fourth stage is sometimes called the "but for" test. To satisfy this test, the employer must show that "its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989).

Unfortunately, in this case the court below did not explicitly make the legal determinations required with respect to the first two stages of the analysis just

---

[23] These first two stages involve questions of law for the court. To facilitate review, the analysis conducted by the district court for these two stages would best be done on the record either in a written opinion or in a decision announced from the bench and transcribed by a court reporter.

25

described. In fact, the court's instruction to the jury and one of the interrogatories given to the jury significantly blurred the issue and suggest that these law calls were put into the jury's hands. The court instructed as follows:

> Under the First Amendment to the Constitution of the United States every public employee has a right to freedom of speech addressing issues of public concern.
>
> In this case, therefore, if you find that the plaintiff engaged in speech activity concerning corruption and mismanagement of the Riviera Beach Police Department, and at the election of candidates for the City Council, you are instructed that the subject of such speech activity was a matter of public concern; and as a public employee, the plaintiff could not legally be penalized because of the plaintiff's exercise of the First Amendment rights in discussing that subject of public concern.

The district court also asked the jury to answer the following interrogatory number 4:

> Do you find from a preponderance of the evidence: That the Plaintiff engaged in protected speech activity concerning corruption and mismanagement of the Riviera Beach Police Department and/or that, as a member of the Police Benevolent Association, he supported candidates for the City Council?

The instruction, when read in tandem with the interrogatory, is quite confusing and suggests that the jury, which should have been deciding only the

factual questions of causation and damages, was improperly allowed to make the *legal* determinations which the judge should have made.[24]

We acknowledge that sometimes a situation might present a factual dispute which must be resolved by the jury before the trial judge is able to make the law calls required by the first two stages of the analysis. That was not the situation here where there was no serious question about the fact that Brochu was vocal concerning alleged corruption and mismanagement and did support candidates for City Council or, for that matter, that he was a key participant in the construction of the "plan."

The district judge should have, on the record, made a clear declaration as to whether (and which of) Brochu's activities could be "fairly characterized as constituting speech on a matter of public concern." *Rankin*, *supra*. Had he done so, we conclude that Brochu's case would have failed at this very first stage of the analysis.

We have no problem concluding that, under the case law, "speech activity concerning corruption and mismanagement of [a] Police Department and/or . . .

---

[24] The jury answered "yes" to interrogatory number 4 and then went on to decide the only issues that were properly within its sphere: whether the activity was a substantial or motivating factor in the decision to place Brochu on administrative leave (interrogatory number 5), whether the City's actions were the proximate or legal cause of damages sustained by Brochu (interrogatory number 6), whether he would have been placed on administrative leave for other reasons even in the absence of protected speech activity (interrogatory number 7) and, if not, whether he was constructively discharged (interrogatory number 8) and, if so, what amount of damages should be awarded (interrogatory number 9).

support[ ] [of] candidates for the City Council" *might be* a matter of public concern. In this case, however, Brochu was not merely "commenting upon matters of public concern," i.e., the alleged ineptitude of his superiors and/or the alleged corruption in the police department, nor was he merely publicly campaigning in favor of candidates he felt would support a reform agenda. Rather, he was a major player in the creation and dissemination of a virtually secret plan to overthrow the existing police administration and put himself and his friends in charge.[25] This was not the sort of public speech activity engaged in by an employee as a citizen which is protected by the First Amendment. This was back-room maneuvering by an employee as an employee which, even if tangentially related to the political process in Riviera Beach and even if motivated by a sincere desire to reform the police department, is not the sort of public discourse which the First Amendment was intended to protect.

Even if one could conclude that creating and disseminating such an overthrow plan somehow constituted protected speech, the stage-two issue, an issue not even addressed by the district court, is whether a First Amendment right to participate in that activity was outweighed by the employer's interests under the facts of this case. The district court should have set forth, on the record, a

---

[25] Only a chosen few were privy to the plan during its development. It was not subject to open public discourse and review. In fact, for the plan to succeed, it was important that it remain a secret.

*Pickering* balancing analysis by weighing Brochu's interest in engaging in protected activities against his employer's interest in "promoting the efficiency of the public services it performs through its employees." *Pickering*, *supra*. Had the district judge properly and explicitly conducted the analysis required, this case would never have reached the jury and the City would have been entitled to judgment as a matter of law.

A police officer is considered "part of a quasi-military organization." *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000) (citing *Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994)). "In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers." *Id*. Although we would conclude that the secret plan created by Brochu was simply not protected speech activity, even if it were, its potential to cause havoc in the police department would, under the teachings of *Oladeinde*, definitively tip the *Pickering* balance in favor of the City. Our *de novo* consideration of the legal determinations which should have been, but were not, made by the district court leads us to conclude that the case should never have gone to the jury. The City was entitled to judgment as a matter of law and it was reversible error not to grant that motion.

There is, arguably, another way of approaching this case, which is perhaps what the district court attempted to do in an effort to "let the jury decide." If we assume that the question which the district court intended to present to the jury was whether Brochu was placed on administrative leave because of his public criticism of the department and his public support of candidates, which the district court's instruction and interrogatory number 4 seem to suggest would be "speech activity [relating to] a matter of public concern," the case would probably have survived a properly-conducted analysis at the first two stages,[26] but it would nonetheless have failed at the fourth stage, the "but-for" causation stage. No reasonable jury, on this record, could have failed to find that the City had a perfectly legitimate reason for placing Brochu on paid administrative leave.[27]

---

[26] Even under this alternative approach, the district court should have first conducted the explicit legal analysis described by our discussion above so as to facilitate appellate review of that analysis.

[27] We believe, however, that the jury may have been overwhelmed by an unwarranted amount of testimony about the *alleged* corruption in the police department. The district judge apparently decided to admit all of this mostly irrelevant material (on the theory that he would "let the jury decide") in order to show the motivation for Brochu's development of the plan. However, the potential for prejudice was too great, especially given the fact that Brochu's motivation was not the issue. It would be very hard for the average juror, drawn from the geographic area of the allegedly corrupt community, to overcome his or her negative feelings about potential corruption. It is easy to see how a jury might feel that it was doing the *community* a service by finding for the plaintiff, whom it might have been inclined to view as a "white knight" of sorts.
    In the judge's defense, we note that the record shows that managing this case was somewhat like riding a wild horse. Counsel fought tooth-and-nail over every issue, delayed the proceedings in every imaginable way, and treated one another with attitudes bordering on contempt, all the while offering little assistance to the judge with their paperwork. It is not difficult to see how the district judge might reach the conclusion that it was simply easier to give the parties their "day in court" and rely on the jury (and the court of appeals) to resolve the issues. In fact, the district judge stated as much on the record in several places.

30

This record is clear that, whether or not Brochu was politically active in the manner described by the district court in the quoted jury instruction and in interrogatory number 4, Brochu would have been placed on administrative leave for creating and allowing the dissemination of a document which he knew would cause, and did cause, havoc in the police department and the community, in complete disregard of the need for "order, loyalty, morale and harmony[.]"

The fact that Brochu might have been legitimately politically active would not give him license to disrupt the operations of the police department. Poreba himself was politically active; he admitted that his position was a "political appointment" and described himself as "politicized." He testified that all City employees, including police officers, are permitted to participate in political activities and, in Riviera Beach, they historically have done so.

Brochu crossed the line when he went beyond political activity as a citizen and created a secret plan, as an employee, to overthrow his superiors and then *shared* that plan with a few civilians in the community, actually enlisting their assistance in effectuating the "coup."

Poreba testified that he had frequently gone to Brochu to seek advice on how to improve operations and that Brochu usually had good ideas. Poreba stated that the situation would have been entirely different had Brochu created his plan and

31

proposed it internally as a way of improving the police department.[28]  Brochu's

mistake was in causing a furor in the community by publicly disseminating the

plan (or at least in not preventing its public dissemination), compromising the

ability of Poreba and the entire police department to function effectively.  Not only

did this go beyond "a citizen . . . commenting upon matters of public concern,"

*Pickering*, 391 U.S. at 568, it actually threatened the effectiveness of the safety

forces, notwithstanding the fact that the plan which Brochu allowed to be leaked

happened to target Poreba himself.

Of course, since the plan targeted Poreba, it may be difficult to separate the

fact that Poreba would undoubtedly have taken the attack personally from the fact

that the public dissemination of the plan resulted in havoc in the community and

the police department.  The mere fact that Poreba may have been genuinely injured

by the plan does not preclude him from acting to stanch the hemorrhage which the

plan's dissemination caused.

The actual reason the City placed Brochu on paid administrative leave, that

is, his creation and dissemination of "the plan," was a legitimate reason.  Although

---

[28]  Admittedly, this is a little hard to imagine given the fact that the plan targeted Poreba and his administration.  But the *theory* does hold water in light of the record which shows that, in the past, Brochu had frequently made suggestions for improvement which had been accepted by the department. In fact, he was generally viewed by his superiors as a person whose advice was valuable, even if he was a little overbearing at times.

Brochu could not have been placed on administrative leave simply for supporting certain candidates in the City council election or for publicly criticizing Poreba or the department, nothing in this record suggests that any employment decision with respect to Brochu was made *because of* these types of political activities. One cannot permanently insulate oneself from a legitimately-motivated adverse employment action by simply becoming politically active and thereafter artificially linking all one's behavior to that allegedly protected political activity. Brochu overstepped the boundary of constitutional protection when he secretly created a written plan aimed at overthrowing Poreba's administration and installing himself and his friends. No reasonable jury could find otherwise on this record.

For all of the above reasons, we conclude that the district court erred in denying the City's motion and renewed motion for judgment as a matter of law on the § 1983 claim. We reverse both the judgment and the award of damages.

b.

Although the parties have argued this case as if Brochu had an independent claim for constructive discharge, that is not what the record shows. In the pre-trial consideration of motions, which occurred immediately before the opening statements of counsel, it was made clear that count 5 was not a claim for constructive discharge but, rather, a § 1983 claim. If Brochu prevailed on that

33

claim, then in order to determine his damages, the jury would have to first

determine whether he voluntarily resigned or was constructively discharged.[29]

This was reiterated at the charge conference on February 28, 2001(day six of the

trial) when the district judge insisted that a jury interrogatory relating to the

constructive discharge issue had to come before the interrogatory relating to

damages.  The instruction ultimately given to the jury was consistent with this

theory of the case.  The district judge instructed the jury as follows:

> with respect to plaintiff's claim for economic damages,
> that is lost wages, . . . if you find from a preponderance
> of the evidence that the plaintiff's conditions of
> employment were intolerable as claimed, then you may
> conclude that the plaintiff was constructively discharged.
> If the plaintiff has not proven such intolerable working
> conditions, then the plaintiff's resignation may be
> considered voluntary and the plaintiff would not be
> entitled to any economic damages result of [sic] the loss
> of employment.

In view of our holding that Brochu did not establish his § 1983 claim

because he was put on administrative leave for a valid reason which had nothing to

do with any speech protected by the First Amendment, Brochu is not entitled to

*any* damages and we need not examine whether a constructive discharge increased

his economic losses.  Had this been a stand-alone claim as opposed to merely an

---

[29]  Obviously, a voluntary resignation would have cut off any damages as of the date of the resignation.  A constructive discharge would have resulted in damages continuing at least up to the date of the trial.

element of damages, we would review it.[30]  Review, however, is not warranted on this record.

C.

The final issue which we must address is whether, after trial, the City made Brochu an unconditional offer of reinstatement which, because of Brochu's acceptance, is now binding upon the City, notwithstanding our resolution of the other issues.

The City argues that, because Brochu was not unlawfully discharged, he is simply not entitled to reinstatement.  The City further argues that there was no offer of reinstatement within the meaning of *Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982) and, if there was such an offer, Brochu rejected it with his own counteroffer, thus forfeiting any right to reinstatement.

Brochu argues that, as found by the district court, the City made an unconditional offer of reinstatement which he accepted before the City attempted to rescind the offer.  In other words, in Brochu's view, his right to reinstatement is

---

[30]  Although we need not review this issue, it bears mentioning that, to show constructive discharge, an employee must prove that his working conditions were "so difficult . . . that a reasonable person would have felt compelled to resign." *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d at 1527 (quoting *Wardwell v. Sch. Bd. of Palm Beach County*, 786 F.2d 1554, 1557 (11th Cir. 1986)).  The constructive discharge issue, being a question of fact, would be subject to the clearly erroneous standard of review. *See Buckley v. Hospital Corporation of America*, 758 F.2d 1525, 1530-31 (11th Cir.1985) (treating constructive discharge as a question of fact for the jury to decide).  In this case, in deciding damages, the jury concluded that Brochu was constructively discharged.  We offer no view as to the propriety of this finding.

35

based more on independent principles of contract law than on any remedial scheme in the relevant civil rights statutes.

In order to correctly analyze this issue, we must note carefully the procedural posture of the case at the time the district judge issued his final judgment on August 10, 2001. Six months earlier a jury had found in favor of Brochu on his Title VII and Section 1983 First Amendment claims and had awarded compensatory damages. The jury's verdict entitled Brochu to equitable remedies, specifically, in the discretion of the district court, *either* reinstatement or front pay.[31] *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1528 (11th Cir.1991); *see also Farley v. Nationwide Mutual Ins. Co.*, 197 F.3d 1322, 1338 (11th Cir.1999). Although the district court had already issued a partial final judgment on March 2, 2001, granting compensatory damages in favor of Brochu, it had reserved jurisdiction to determine prospective relief.

Both the City and Brochu point to *Ford Motor Co.*, *supra*, as support for their respective positions. In *Ford Motor Co.*, the defendant automobile manufacturer was accused of refusing to hire women at one of its warehouses.

---

[31] The jury, properly instructed by the district court with respect to damages, included within the compensatory damages an award of backpay from the date of the unlawful employment action to the date of trial. In order to truly make a successful plaintiff whole, he or she is further entitled to either reinstatement or to what has come to be known as "front pay," that is, an amount of money awarded after trial in lieu of, or until, reinstatement. Front pay, like reinstatement, is a form of equitable relief which is determined by the court. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 847-48 (2001).

36

Several women filed EEOC charges. Ford, in an effort to stop the potential for back pay damages in a case which would undoubtedly take years to wind its way through the system, later offered to hire the women into the positions they had originally been denied. The women refused the offer. A lawsuit was subsequently filed against Ford by the EEOC. When Ford lost, the district court awarded backpay, among other forms of relief, and rejected Ford's contention that its offer of employment had stopped the accrual of backpay damages. On appeal, the Fourth Circuit affirmed and suggested that, had Ford promised retroactive seniority with its job offer, the offer would have cut off Ford's backpay liability. The Supreme Court was faced with the question of whether an offer of retroactive seniority, along with the job offer, was required as a condition for tolling the backpay. The Court decided in the negative and reversed and remanded the case.

*Ford Motor Co.* broadly stands for the proposition that one accused of (and, presumably, one already adjudicated liable for) a civil rights violation can toll the continuing accrual of backpay damages by making an unconditional offer of hiring or, under our facts, *re*-hiring.

In his motion for prospective relief, Brochu requested "front pay."[32] The

district court conducted a hearing.[33] No testimony was taken; however, arguments

of counsel were heard, during which at least one exhibit was offered and

admitted,[34] and the City's counsel was permitted to make a proffer.[35]

---

[32] The terminology can be confusing. However, as noted by the Supreme Court in *Pollard v. E.I. du Pont de Nemours & Co.*, *supra*, "backpay" and "front pay" are essentially the same thing. The original Title VII language authorizing "backpay" awards was modeled after similar language in § 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c), which "had been construed to allow awards of backpay up to the date of reinstatement, even if reinstatement occurred after judgment." 532 U.S. at 853. These types of awards which accrue after the date of judgment have come to be called "front pay," although they really have the same remedial purpose as the "backpay" authorized by the statute.

[33] The transcript of this hearing is in the record (R. 444); however, the exhibit(s) relied upon by the parties and the district court are *not* in the record. We also note that, judging from the context of the arguments of counsel and the questions and comments of the district court, the transcript of the hearing frequently misidentifies the speakers. It often identifies the City's counsel as the speaker when the context clearly indicates that it was Brochu's counsel. Nonetheless, we believe we have managed to sort out the arguments so as to attribute them to the proper party as we engage in our analysis.

[34] *See* R. 444 at 17, 24 (admitting as Exhibit 1 a letter of July 16, 2001 which contained the City's "unconditional offer of reinstatement" which is the subject of the instant dispute).

[35] At the end of the hearing, the district court allowed the City to make the following proffer with respect to the offer-and-acceptance issue:

> MR. MCLEAN: . . . I would prefer to put the manager on, but let me just proffer, if the Court would accept my proffer, for the record, in terms of the offer.
>
> There were two things about it. The manager who is here today, Mr. Wilkins, authorized the submitting of a letter in the context of prospective relief in terms of this hearing for the purpose of trying to avoid both the time and the necessity of coming here, if we could have done that, and avoided the expense that everybody has incurred so far in coming; and also to avoid, really, Your Honor, we didn't know how the Court might have ruled on these issues and front pay consideration was a concern for the City, given the calculation we arrived on discovery and what it might be for the City in terms of the fiscal impact of it.
>
> So we, basically, said that we wanted to have in terms of the option to go reinstatement or to go front pay. We wanted to put in a

38

proffer where the Court would go reinstatement and that would be included in a judgment.

As to the offer in terms, you know, acceptance, if you will, Your Honor, when the plaintiff attorneys got up, they spoke to the Court. They did not say that they were accepting the offer. They said we are talking to our clients. [sic] "We don't know." They said, "We are looking at -- we just talked to him this morning."

And just before we started the hearing, he is considering this whole idea of reinstatement. Number one, for our purposes, it did not avoid what we hope to avoid, which was having to be here at all, but I got up and said. Of course, what do you expect me to do? What are you looking for me? Judge can hold the hearing and order reinstatement if it is appropriate.

After that discussion, the court recessed. We were discussing -- I didn't know they had an order, but they brought up an order. And we were looking over the order at various points of the order, and we talked about putting reinstatement as part of that.

I said, "Well, fine, we can have this as part of the order."

Mr. Amlong came up and said, "Of course, that is going to be that there will not be a stay of that order."

I said, "No, no, that's not correct. If it is included in the order, we want to maintain our right to appeal and offer a stay."

He didn't say, "Well, there is an offer out here."

I said, "No, there is not an offer out here."

He says, "Well, I accept your offer." And at that point in time, Your Honor, I want to go ahead and get the facts into the record as to what happened.

One, that there was clearly -- we didn't get what we were hoping for in terms of trying to deal with the prospective relief portion, but in discussion when it came up, it was clear from our discussion, when they say they are putting in the judgment -- they have a judgment.

And he said, "Of course, you mean it is going to be you can't appeal or there won't be a stay."

I said, "No, that's not correct."

39

During that hearing, the district court made the following findings on the record:

> . . . I'm finding that the City has made an unconditional offer of reinstatement based upon this letter dated July 16, 2001.
>
> I find also, based upon representation of counsel, that the plaintiff is willing to accept this unconditional offer of reinstatement. And based upon that offer and that acceptance, I will enter an order, reinstating, ordering that reinstatement to his prior position is the better remedy than determining front pay.
>
> And this reinstatement will include any backpay from the time of the partial judgment. It will include any contributions to the pension plan.
>
> It will require Mr. Brochu to pay back anything that he has withdrawn from the pension plan under the terms of the agreement, whether interest is required. It may be that he has to pay it back with interest, probably would be.
>
> That he would be entitled to an appropriate salary based upon his tenure as an [sic] lieutenant in the Riviera Beach Police Department.
>
> * * *

---

It was after that point in time when he said, "Okay, well, you have an outstanding offer. I accept it."

And I said, "No, I do not." And that's how it ended.

R. 444 at 53-55.

> Of course, what I say on the record, doesn't necessarily have to be included, every word of it, in a final judgment, but I'm finding on the record that he made an offer of unconditional reinstatement, and that has been accepted and now we are just working out the details now [sic].

R. 444 at 22-24.

On August 10, 2001, the district court memorialized these findings and his legal conclusions in a very detailed Final Judgment Awarding Prospective Relief. *See* R. 437. There, the district court found:

> . . . Thus, regardless of any appellate determination concerning the jury's verdict of March 2, 2001, the Court finds that the City has offered and Brochu has accepted reinstatement effective July 26, 2001. Should the City seek to stay this order, and should the Court of Appeals agree with this Court concerning the offer-and-acceptance, Brochu will be deemed reinstated retroactive to the date of this final judgment.

R. 437 at 2.

Although the district court's award of prospective relief made sense in light of the procedural posture of the case at the time (i.e., the fact that Brochu was the prevailing party) and although we find no abuse of the district court's discretion, our decision to overturn the jury's verdict and to order judgment as a matter of law in favor of the City mandates reversal of the order of prospective relief.

41

We write further, however, to clarify one issue that arose during the July 26, 2001 hearing. Again we emphasize that one must not forget the *procedural* posture of the case. The parties were called to a hearing on Brochu's motion for prospective relief in the form of front pay. Although the hearing Exhibit 1 has not been included in this record, it was apparently a letter from the City's attorney to Brochu's attorney dated July 16, 2001. It was sent "to confirm our telephone conversation today in which we unconditionally offered to reinstate your client[.]" R. 444 at 9. At the hearing, the City consistently insisted that it sent the letter as an attempt to avoid having to come to the hearing and put in a lot of evidence to establish a front pay award (which Brochu had requested). The City believed that, if there was to be an award of equitable relief, it should be reinstatement, not front pay. The City also made clear at the hearing that it believed it retained the right to appeal the jury's verdict, notwithstanding the language of an "unconditional offer" of reinstatement.

The district judge seemed to view the July 16, 2001 letter in contract terms; that is, he viewed it as an "offer" which, according to the court, had been "accepted" by Brochu, as represented by his counsel.[36] The Court stated: "If you

---

[36] A careful reading of the transcript of the hearing reveals no such representation by counsel. At best, counsel "waffled" when addressing the concept of his client's "acceptance" of the City's "offer." There was certainly no sworn testimony that Brochu had "accepted" an "offer" of reinstatement, nor was any documentary evidence submitted.

42

are offering reinstatement, how can you appeal it? It seems to me that that [sic] whatever you all agree to can't be appealed *because it's like a stipulation*." R. 444 at 14 (emphasis added).

Clearly, this reflects a misunderstanding of the "offer" made by the City. The City's letter of July 16, 2001 was not an "offer" in the sense that contract law uses that word. It was no more than the City's assertion that, in its view, reinstatement was the proper remedy, *if there was to be a remedy*. The City was not asking Brochu to compromise his claims, already decided in his favor. The City was not attempting to enter into some sort of consent decree or stipulation. In fact, clearly, the only reason the City "offered" reinstatement at all was as a means of tolling backpay/front pay damages to which Brochu would be entitled even if he were reinstated.[37] In the City's view, the jury's verdict was wrong and it wanted the opportunity to appeal; but it also wanted to stop the accrual of damages.

Brochu's view, and seemingly that of the district court, is that even if we overturn the jury's verdict, which we have done, there was some sort of "contract" formed when the City "offered" and Brochu allegedly "accepted" reinstatement. We cannot accept that view because it is completely divorced from the *context* in

---

[37] In fact, the actual backpay awarded by the district court was the small amount of $9,500.00.

43

which the City's "offer" occurred.[38]  That view would, in essence, require us to

---

[38]  This context is set forth clearly in the transcript:

THE COURT:  What was this letter here?  It says you are offering reinstatement?

MR. MCLEAN:  I understand the letter was sent out and the letter was sent out to talk about what the appropriate relief would be once we got before Your Honor.  That's why we sent the letter out.

We never opposed -- we don't think we should have a hearing to go through a hearing to talk about determining front pay, Your Honor.

We think that the appropriate remedy, and we have said that over and over again in our dialogue with them is reinstatement, that an order of reinstatement is the appropriate remedy.

THE COURT:  How can you be advocating an order of reinstatement and also want to appeal it?

MR. MCLEAN:  Your Honor, I think it serves judicial economy.

THE COURT:  The point is you are saying, you want to reinstate him, but if you do that, you are going to appeal it and say that was wrong to reinstate him.

MR. MCLEAN:  Your Honor, if we had won the factual issue before the jury, we would say, "We don't need to reinstate him at all." We lost that issue.

THE COURT:  I'm not talking about your ability to appeal whatever happens in the trial, but the question now is if you are saying you are offering unconditionally to reinstate him, what I hear you saying is, "But if we win the appeal then everything is off."

MR. MCLEAN:  Your Honor, we don't have that offer.  I'm trying to put it in the context.

THE COURT:  Your don't have an offer then?

MR. MCLEAN:  Your Honor, I'm trying to put it in context. The discussion was about what was the appropriate relief.  We believe that the appropriate relief, contrary to the contention, filing the motion in May and June, was an order of reinstatement in order to make this plaintiff whole.

THE COURT:  Well, the plaintiff is saying I'm willing to accept the reinstatement.

MR. MCLEAN:  Your Honor, the issue is not one of acceptance. Your Honor, we came into court this morning or this afternoon, not with the expectation of acceptance of an offer.  We came here to try our case, to put on the case, that the appropriate remedy was reinstatement.

THE COURT:  If he is agreeing, why do we have to put on a case?  You are saying reinstatement.  He says, "I accept reinstatement."

MR. MCLEAN:  I'm saying that is the appropriate remedy.  I do agree with that, that it is the appropriate remedy.

THE COURT:  How can you then appeal that?

MR. MCLEAN:  Your Honor, what I'm suggesting is, if, in

44

believe that the City would have been willing to reinstate Brochu even if the jury's verdict had been in favor of the City, the condition which now results from our rulings on the merits of this case. This simply does not make sense, especially when viewed in the proper procedural context.

Accordingly, for the reasons set forth above, we REVERSE the final judgment awarding prospective relief entered on August 10, 2001.

### III.

In conclusion, we REVERSE the judgment of the district court and REMAND for entry of judgment in favor of the defendant-appellant and for further proceedings not inconsistent with this opinion.[39]

---

contrast to an order of front pay, reinstatement is the preferred remedy in this case.

THE COURT: And everybody is agreeing now. How can you turn around and appeal that?

MR. MCLEAN: Your Honor, the reason I can turn around and suggest an evaluation of appealing it because the fundamental basis for this Court to even grant any relief in this case are the issues which were tried back in February.

Those issues are not -- are viewed and looked at differently by the Eleventh Circuit, then there is no entitlement to any relieve [sic], but the only way we are here today on the relief issue is that the jury hasn't spoken on that card, but that issue has yet to be looked at and evaluated by the court. That's what I'm saying.

R. 444 at 14-17.

[39] The district court's docket reflects a separate appeal taken from an order of December 3, 2001 which awarded attorney fees and costs to Brochu. Our records show that this appeal is in its early stages, still awaiting briefing. *See* No. 02-10088FF. Since, under our present ruling, Brochu is no longer the prevailing party, we leave to the district court and the parties what, if any, proceedings are required with respect to this December 3, 2001 order and its appeal, which is not before us.