[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 29, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13582

_____

D. C. Docket No. 05-00563-CV-T-26-TBM

MICHAEL L. D'ANGELO,

Plaintiff-Appellant,

versus

SCHOOL BOARD OF POLK COUNTY, FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 29, 2007)**

**ON PETITION FOR REHEARING**

Before PRYOR, KRAVITCH and ALARCÓN,* Circuit Judges.

PRYOR, Circuit Judge:

_____

 *Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Our previous opinion in this appeal issued on August 1, 2007. After we issued our opinion, the district court found that by error or accident the clerk had failed its duty to forward to this Court the exhibits admitted at trial. See Fed. R. App. P. 10(a)(1), 11(b)(2). As it is permitted in this circumstance, the district court has transmitted those exhibits to this Court to correct the record. See Fed. R. App. P. 10(e)(2)(B). In the light of this development, we grant the petition for panel rehearing filed by Michael L. D'Angelo, vacate our previous opinion, and substitute the following opinion in its place.

The issue in this appeal is whether the district court erred when it entered judgment as a matter of law against a high school principal who argues that the school board violated the First Amendment when the board terminated him in retaliation for his efforts to convert his school to a charter school. While he served as principal of Kathleen High School in Polk County, Florida, D'Angelo met with teachers, consulted with principals of other local high schools, and held two faculty votes regarding the conversion of his school to charter status. D'Angelo complains that the School Board of Polk County discharged him in retaliation for the exercise of his rights to freedom of speech, to petition the government for redress of grievances, and to freedom of association. The district court reasoned that D'Angelo's efforts to convert Kathleen High to charter status were "part and parcel

2

of his official duties" and were not undertaken as a citizen. The district court concluded that, in the light of Garcetti v. Ceballos, 547 U.S. __, 126 S. Ct. 1951 (2006), D'Angelo's work as principal was not protected by the First Amendment and granted the school board judgment as a matter of law. We affirm.

## I. BACKGROUND

On June 11, 2002, the school board hired D'Angelo to be the principal of Kathleen High. The school did not compare favorably with other high schools in Polk County and had received a "D" grade on the Florida Comprehensive Assessment Test. D'Angelo made improvements and, within one year, raised the assessment score to a "C" grade.

After he learned that the school would not receive additional staff or funding, D'Angelo explored converting the school to charter status. Florida law provides that "[c]harter schools shall be part of the state's program of public education." Fla. Stat. § 1002.33(1). "An application for a conversion charter school shall be made by the district school board, the principal, teachers, parents, and/or the school advisory council . . . ." Id. § 1002.33(3)(b). Charter conversion requires the support of at least 50 percent of the teachers employed at the school. Id.

Beginning in the spring of 2003, D'Angelo took several steps toward charter

3

conversion. He and other individuals from his school attended a seminar on charter schools. He held staff meetings at school and divided the faculty into committees to study and give reports on charter schools. D'Angelo also met on several occasions with the principals of other local high schools to discuss charter conversion.

In an email to an assistant principal at Kathleen High, D'Angelo explained his duty to pursue charter conversion. D'Angelo wrote that he "in good conscience could not continue the practice of providing an inferior educational opportunity to [the] ESE students [at Kathleen High]." He explained that, "with[] the charter opportunities granted by the State of Florida[, he] would be remiss in [his] duties as the leader of Kathleen High School if [he] did not explore any and all possibilities to improve the quality of education at [the school]."

D'Angelo testified at trial that charter conversion was not "one of [his] assigned duties," but he admitted that "[i]t was incumbent upon [him] to investigate Charter and to move towards Charter for the betterment of the students at Kathleen High School." He explained that his "number one duty, and the duty of any principal, [wa]s to do whatever [he could] for the kids." According to D'Angelo, "if [principals] don't do everything [they] possibly can to create avenues for kids to succeed, then . . . [they] are [not] doing [their] duty." One

4

aspect of D'Angelo's "job as a principal" was to "provide the best educational opportunities [he could]," and he "felt that [his] responsibility as a leader [of Kathleen High] was to make sure that [he] exhausted every avenue that [he] could, and Charter happened to be one." D'Angelo "pursu[ed] Charter School for Kathleen High School . . . to meet the mission and vision of [the] Polk County [School District]."

D'Angelo's performance evaluations reveal that he was expected to support the mission and vision of the school district. His list of "specific job duties and responsibilities" included the obligation to "provide leadership for and implement school improvement initiatives." As principal of the high school, D'Angelo's "major function" was to "provide the vision and leadership necessary to develop and administer educational programs that optimize the human and material resources available for a safe and successful school for students, staff, parents, and community while emphasizing the learning process for all students leading to enhanced student achievement."

An initial faculty vote on charter conversion occurred on October 15, 2003, but the votes were not tallied because of an irregularity with the number of ballots. On April 15, 2004, the rescheduled faculty vote failed with 33 votes in favor of conversion and 50 votes against. D'Angelo then planned to convert only part of

Kathleen High to charter status and invited teachers interested in this new plan to attend a meeting at 2:00 PM on April 19.

The meeting did not occur. The superintendent called D'Angelo on the day of the meeting, and D'Angelo cancelled the meeting. According to D'Angelo, the superintendent "was not happy that [D'Angelo] was going to have a meeting" and "was kind of upset that [D'Angelo and others] were still continuing on the Charter process." Some members of the school board also had been displeased with D'Angelo's efforts to convert Kathleen High to charter status.

On May 3, D'Angelo was called to the district office and terminated. Four days earlier, D'Angelo had received a rating of "[h]igh quality performance" from the deputy superintendent. Contemporaneously, Kathleen High had received a favorable evaluation from the Southern Association of Colleges and Schools.

D'Angelo filed a complaint with the Florida Department of Education. Florida law provides that "[n]o district school board, or district school board employee who has control over personnel actions, shall take unlawful reprisal against another district school board employee because that employee is either directly or indirectly involved with an application to establish a charter school," Fla. Stat. § 1002.33(4), and an employee may file a complaint with the Department of Education within 60 days, id. § 1002.33(4)(a)(1). After investigation, the

6

Department of Education concluded that there was no "direct correlation to D'Angelo's contract not being renewed due to the fact that he attempted to convert Kathleen High School to a charter school."

D'Angelo filed a complaint in federal district court that alleged the school board had terminated him in retaliation for his exercise of rights protected by the First Amendment. The action proceeded to a jury trial, and after the close of D'Angelo's case-in-chief, the school board moved, under Federal Rule of Civil Procedure 50(a), for judgment as a matter of law. In his argument against the motion, D'Angelo clarified that he was "raising First Amendment claims on petitioning, association and speech related to charter only."

The district court granted the motion of the school board. The court concluded that, under Garcetti, D'Angelo's speech was not protected by the First Amendment. The court then determined that there was "absolutely no evidence in th[e] record to support" D'Angelo's complaint that the school board violated his rights to free association and to petition the government for redress of grievances.

## II. STANDARD OF REVIEW

"A Rule 50 motion for judgment as a matter of law is reviewed de novo . . . ." Abel v. Dubberly, 210 F.3d 1334, 1337 (11th Cir. 2000). We view the evidence in the light most favorable to D'Angelo, but he "must put forth more than

7

a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." Id.

## III. DISCUSSION

D'Angelo presents three arguments on appeal. He contends that the district court erred when it entered judgment as a matter of law against his three claims that the school board discharged him in retaliation for his exercise of rights to freedom of speech, to petition the government for redress of grievances, and to freedom of association. We affirm the district court on each ground.

*A. The District Court Correctly Entered Judgment as a Matter of Law Against D'Angelo's Claim That the School Board Violated His Right to Freedom of Speech.*

A few weeks before D'Angelo's jury trial, the Supreme Court held in Garcetti that a public employee who spoke "pursuant to [his] official duties" had "not sp[oken] as [a] citizen[]" and was not protected by the First Amendment. 126 S. Ct. at 1960. The district court concluded that, under Garcetti, D'Angelo had not engaged in protected speech. The court reasoned that D'Angelo's efforts to convert Kathleen High to charter status were "part and parcel of his official duties and . . . done in his capacity as the principal of [the school]." We agree with the district court.

Our analysis of this issue is divided into two parts. First, we discuss the law

8

in this Circuit regarding the termination of a public employee in retaliation for that employee's exercise of his right to freedom of speech, and we explain the effect of Garcetti on those precedents. Second, we consider whether D'Angelo engaged in protected speech.

### 1. A Public Employee Must Speak Both on a Matter of Public Concern and as a Citizen to Receive Protection Under the First Amendment.

Before Garcetti, "it [was] well-established that an employer [could] not discharge a public employee in retaliation for the employee's exercise of his right to freedom of speech," but "th[e employee's] right [to free speech was] not absolute." Brochu v. City of Riviera Beach, 304 F.3d 1144, 1157 (11th Cir. 2002). As the Supreme Court first explained in Pickering v. Board of Education, "the interests of the [employee], as a citizen, in commenting upon matters of public concern" had to be balanced against "the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968). "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency . . . ." Connick v. Meyers, 461 U.S. 138, 147, 103 S. Ct. 1684, 1690 (1983).

9

We adopted the "four-stage analysis [that] evolved [after <u>Pickering</u>]" for actions that involved the termination of a public employee in alleged retaliation for that employee's exercise of First Amendment rights. <u>Brochu</u>, 304 F.3d at 1157. The first stages were "questions of law designed to determine whether the First Amendment protect[ed] the employee's speech." <u>Anderson v. Burke County</u>, 239 F.3d 1216, 1219 (11th Cir. 2001). At the first stage, "the threshold legal question [was] whether the employee's speech [could] be fairly characterized as constituting speech on a matter of public concern." <u>Brochu</u>, 304 F.3d at 1157 (internal quotation marks omitted). We sometimes also asked "whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee." <u>Morris v. Crow</u>, 142 F.3d 1379, 1382 (11th Cir. 1998) (internal quotation marks omitted).

In <u>Garcetti</u>, the Supreme Court emphasized that a public employee must speak both on a matter of public concern and as a citizen to be protected under the First Amendment. The Court noted that the court of appeals had considered whether Richard Ceballos, the public employee who had been terminated, spoke on a matter of public concern but had failed to consider whether the speech was also "made in Ceballos' capacity as a citizen." <u>Garcetti</u>, 126 S. Ct. at 1956. The Court then cited the precedents of <u>Pickering</u> and <u>Connick</u> for the principle that "the First

10

Amendment protects a public employee's right . . . to speak <u>as a citizen</u> addressing matters of public concern," <u>Garcetti</u>, 126 S. Ct. at 1957 (emphasis added), and reversed the court of appeals because Ceballos spoke "pursuant to [his] official duties . . . [and] not . . . as [a] citizen[]," <u>id.</u> at 1960.

Ceballos had been employed as a calendar deputy district attorney in Los Angeles County. <u>Id.</u> at 1955. According to Ceballos, it was not unusual for persons employed in that capacity to be asked by defense attorneys to investigate aspects of pending criminal actions. <u>Id.</u> In February 2000, a defense attorney contacted Ceballos and asked him to investigate an affidavit that supported a search warrant in a pending criminal action. <u>Id.</u> Ceballos wrote a memorandum that questioned the affidavit and recommended dismissal of the case. <u>Id.</u> at 1956. Ceballos complained that he was then reassigned, transferred, and denied a promotion in violation of his First Amendment right to free speech. <u>Id.</u>

The Supreme Court concluded that Ceballos "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case," because Ceballos did not dispute that he prepared the memo "pursuant to his duties as a calendar deputy." <u>Id.</u> at 1960. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their

11

communications from employer discipline." Id. The Court never considered whether Ceballos's speech was on a matter of public concern.

After Garcetti, we and several of our sister circuits refined our analysis of the first step of the Pickering test. In Battle v. Board of Regents, we initially described the threshold legal question as whether "'the employee's speech is on a matter of public concern.'" 468 F.3d 755, 760 (11th Cir. 2006) (quoting Anderson, 239 F.3d at 1219). We then quoted Garcetti and restated that threshold question: "we must first ask 'whether the employee spoke as a citizen on a matter of public concern.'" Id. at 760 (quoting Garcetti, 126 S. Ct. at 1958) (emphasis added). The Tenth Circuit concluded that Garcetti "revisit[ed]" and "significantly modified" the "first prong," Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1328 (10th Cir. 2007), and the Seventh Circuit explained that "Garcetti . . . holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job," Mills v. City of Evansville, 452 F.3d 646, 647 (7th Cir. 2006). See also Reuland v. Hynes, 460 F.3d 409, 415 & n.5 (2d Cir. 2006).

The district court correctly concluded that "Garcetti factors into th[e] first stage." It then determined that, in the light of Garcetti, D'Angelo failed the first stage and had not engaged in protected speech. We agree and address that issue

12

next.

### 2. D'Angelo Did Not Speak as a Citizen.

D'Angelo's speech on charter conversion is not protected by the First Amendment because he did not speak as a citizen, as required by Garcetti. We come to this conclusion for at least two reasons, and we discuss each reason in turn.

First, it is clear from Florida law that D'Angelo undertook his efforts to convert Kathleen High to charter status in his capacity as the principal and not as a citizen. The Flordia statute that governs the establishment of charter schools provides, "An application for a conversion charter school shall be made by the district school board, the principal, teachers, parents, and/or the school advisory council." Fla. Stat. § 1002.33(3)(b). Because there is no evidence that D'Angelo was a parent or a teacher, his efforts to convert Kathleen High to charter status necessarily were in his capacity as the principal of the school.

Second, the Supreme Court held in Garcetti that a public employee who "make[s] statements pursuant to [his] official duties . . . [is] not speaking as [a] citizen[]," 126 S. Ct. at 1960, and D'Angelo admitted that his efforts to convert his school to charter status were to fulfill his professional duties. D'Angelo was not expressly assigned the duty to pursue charter conversion, but the Supreme Court

13

explained in Garcetti that "the listing of a given task . . . is n[ot] necessary . . . to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Id. at 1962. It is enough that D'Angelo admitted that he pursued charter conversion to "explore any and all possibilities to improve the quality of education at [his school]," which was one of his listed duties and he described as his "number one duty" in his "job as a principal." See Battle, 468 F.3d at 751 (relying on admission of plaintiff that "she had a clear employment duty"). Although D'Angelo and the amici curiae now argue that these admissions were about D'Angelo's moral obligations as a human being and not his responsibilities as a principal, D'Angelo's unambiguous statements do not support this characterization.

The amici contend that certain evidence in the record supports their position. They focus on the email D'Angelo sent to his assistant principal, in which D'Angelo explained that he "would be remiss in [his] duties as the leader of Kathleen High" if he did not pursue charter conversion. The amici note that D'Angelo then wrote, "My obligation is to do the right thing," which in their view proves that D'Angelo was not discussing his professional responsibilities.

The argument of the amici fails. The statement to which they refer is part of a quotation by William Carey, the English missionary, that D'Angelo included at

14

the end of his email. The record includes many emails by D'Angelo in which he similarly included quotations from Scripture and by famous individuals, such as Dr. Martin Luther King, Jr., the composer Jean Sibelius, and the Chinese philosopher Lao-Tze. Taken in context, the quotation does not change the clear meaning of D'Angelo's earlier statements in the email. Any reasonable reader would understand that D'Angelo believed he was obliged to carry out his duties as the leader of Kathleen High and pursue charter conversion.

Because there is no genuine dispute that D'Angelo's efforts to convert his school to charter status were to fulfill his official responsibilities, we do not need a method to define D'Angelo's duties. Like the plaintiff in Garcetti, D'Angelo admitted that his actions were "pursuant to his [official] duties." 126 S. Ct. at 1961. We find ourselves in the same circumstance as the Supreme Court and "have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties." Id. We decline the invitation of both parties to engage that question and leave it for an appeal where "there is room for serious debate." Id.

As a final matter, we do not adopt the emphasis the district court placed on D'Angelo's use of school resources in his efforts to convert Kathleen High to charter status. Although D'Angelo often used school resources and spoke on

15

school premises about charter conversion, we do not rely on that fact to conclude that D'Angelo did not speak as a citizen. As the Supreme Court explained in Garcetti, "[m]any citizens do much of their talking inside their respective workplaces." Id. at 1959. We also do not rely on the fact that D'Angelo's speech might be construed as "concern[ing] the subject matter of [his] employment," because that fact also "is nondispositive." Id.

*B. The District Court Correctly Entered Judgment as a Matter of Law Against D'Angelo's Claim That the School Board Violated His Right to Petition the Government for Redress of Grievances.*

The district court found "absolutely no evidence in th[e] record to support" D'Angelo's claim that the school board violated his right to petition the government for redress of grievances and granted the school board judgment as a matter of law on that claim. D'Angelo asserts that his pursuit of a charter school application for Kathleen High was "by definition" a petition to the government for redress of grievances. We agree that the school board is entitled to judgment as a matter of law on this claim.

Before Garcetti, we applied the same threshold legal question to a public employee who argued that he had been terminated in retaliation for exercise of his right to petition the government as we did to an employee who asserted that he had been terminated for his speech. Instead of asking whether the speech was on a

16

matter of public concern, as discussed earlier, we asked whether the "public employee's petition . . . address[ed] a matter of public concern." Grigley v. City of Atlanta, 136 F.3d 752, 755-56 (11th Cir. 1998). We explained that the rationale of the public concern requirement "applie[d] to expression that takes the form of a petition as well as expression that takes the form of speech," because "[t]he Petition Clause is not entitled to any greater protection than the Free Speech Clause." Id. at 755 (citing McDonald v. Smith, 472 U.S. 479, 485, 105 S. Ct. 2787, 2791 (1985)).

For the same reason, we now apply the threshold legal question that has developed in the free speech context after Garcetti. We ask whether the public employee made his petition both on a matter of public concern and as a citizen. If the petition fails this threshold question, it is not protected under the First Amendment.

Assuming that D'Angelo's efforts to convert his school to charter status can be considered a petition to the government, D'Angelo's petition fails the threshold question. As explained earlier, D'Angelo's efforts to convert Kathleen High to charter status were not undertaken as a citizen. D'Angelo acted in his capacity as the principal of Kathleen High and to fulfill his professional responsibilities. The school board is entitled to judgment as a matter of law.

17

*C. The District Court Correctly Entered Judgment as a Matter of Law Against D'Angelo's Claim That the School Board Violated His Right to Freedom of Association.*

As with D'Angelo's petition claim, the district court found "absolutely no evidence in th[e] record to support" D'Angelo's claim that the school board violated his right to free association and granted the school board judgment as a matter of law. D'Angelo argues that he presented evidence of many meetings regarding the conversion of Kathleen High to charter status. Again, we agree that the school board is entitled to judgment as a matter of law.

We begin with a significant difference between this claim and the previous two claims. Despite the instruction of the Supreme Court that the different guarantees of the First Amendment are "cut from the same cloth," McDonald, 472 U.S. at 482, 105 S. Ct. at 2789, we have not applied the same threshold legal question to public employees who argue that they were terminated in retaliation for exercise of their right to free association as we have to those who argue that they were terminated for their speech or petitions. We have long held that, unlike speech or petitions by public employees, associational activity by public employees need not be on matters of public concern to be protected under the First Amendment. See, e.g., Hatcher v. Bd. of Pub. Educ. & Orphanage, 809 F.2d 1546, 1558 (11th Cir. 1987); Cook v. Gwinnett County Sch. Dist., 414 F.3d 1313, 1320

(11th Cir. 2005) (citing Hatcher). But see, e.g., Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2004) (associational conduct by public employee must touch on matter of public concern); Klug v. Chi. Sch. Reform Bd. of Trs., 197 F.3d 853, 857 (7th Cir. 1999) (same); Boals v. Gray, 775 F.2d 686, 692 (6th Cir. 1985) (same). We explained in Hatcher that "application of a requirement that associational activity relate to a matter of public concern in order to be constitutionally protected would overturn Supreme Court and Eleventh Circuit jurisprudence," such as NAACP v. Alabama, 357 U.S. 449, 78 S. Ct. 1163 (1958). Hatcher, 809 F.2d at 1558.

The question is whether the holding in Garcetti nevertheless applies to public employees who argue that they were terminated for exercise of their right to free association and requires those public employees to have engaged in associational activity as citizens to be protected under the First Amendment. We conclude that it does. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." Garcetti, 126 S. Ct. at 1958. Because "[n]one of 'the great liberties insured by the First (Amendment) can be given higher place than the others,'" the requirement of Garcetti applies to the right of a public employee to associate as it applies to the rights of a public employee to speak and to petition the government. Robinson v. Price, 615 F.2d 1097, 1099 (5th Cir. 1980) (quoting Prince v. Massachusetts, 321

19

U.S. 158, 164, 64 S. Ct. 438, 441 (1944)); see also Cobb, 363 F.3d at 105 ("[T]here . . . exist[s] no hierarchy among First Amendment rights.").

Our decision in Hatcher does not counsel otherwise. In Hatcher, we were compelled by precedents of the Supreme Court and this Court to disregard the ordinary rule that rights under the First Amendment are co-equal. The Supreme Court had explained in NAACP v. Alabama that the subject matter of constitutionally protected associational activity was "immaterial," 357 U.S. at 460-61, 78 S. Ct. at 1171, and we had previously protected under the First Amendment associational activity by public employees on matters of private interest, see Wilson v. Taylor, 733 F.2d 1539 (11th Cir. 1984), abrogation on other grounds recognized by Scala v. City of Winter Park, 116 F.3d 1396, 1402 & n.4 (11th Cir. 1997); Hastings v. Bonner, 578 F.2d 166 (5th Cir. 1978). We had no choice but to conclude in Hatcher that the public concern requirement for speech by public employees did not also apply to their associational activity.

Unlike in Hatcher, we are not compelled in this circumstance to set aside the ordinary rule. We are not aware of any precedents of the Supreme Court or this Court, including Hatcher and the precedents discussed in Hatcher, that preclude extension of the requirement of Garcetti to the First Amendment right of a public employee to associate. The Supreme Court precedent that we cited in Hatcher

20

pertains only to the subject matter of constitutionally protected associational activity by public employees and has no bearing on whether we can require public employees to engage in associational activity as citizens to be protected by the First Amendment. Our decision in Hatcher is consistent with an extension of the requirement of Garcetti, because we protected, under the First Amendment, associational activity by a public employee as a citizen. See Hatcher, 809 F.2d at 1555-58 (protecting former principal's participation at a protest and her choice to bring a minister and school board member to a meeting with the superintendent about her job reassignment). The precedents of this Court that we cited in Hatcher are similarly consistent with an extension of the requirement of Garcetti. See Wilson, 733 F.2d at 1544 (protecting police officer's choice to date a felon's daughter); Hastings, 578 F.2d at 141-42 (protecting teacher's choice to bring her husband and representative of state teacher organization to a meeting with the superintendent about her personal contract).

"To hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." Garcetti, 126 S. Ct. at 1961. As the Supreme Court discussed in Garcetti, "[g]overnment employers . . . need a significant degree of control over their employees' words and actions,"

21

including the associational activity of public employees as employees. Id. at 1958. Restricting associational activity that is not undertaken as a citizen, but "that owes its existence to a public employee's professional responsibilities[,] . . . . simply reflects the exercise of employer control over what the employer itself has commissioned or created." Id. at 1960.

In the light of Garcetti, the school board is entitled to judgment as a matter of law on D'Angelo's associational claim. D'Angelo relies for his claim on meetings about charter conversion that he held or attended, and we have already explained that his efforts to convert Kathleen High to charter status were not undertaken as a citizen. His associational activity is not protected by the First Amendment.

## IV. CONCLUSION

The judgment of the district court is

**AFFIRMED.**